Slip Op. 18 - 28

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| THE DIAMOND SAWBLADES MANUFACTURERS' COALITION, *et alia*, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Before: R. Kenton Musgrave, Senior Judge Consol. Court No. 16-00124 |
| UNITED STATES, | : : | |
| Defendant. | : : : | |

## OPINION and ORDER

[Remanding 2013-14 administrative review of antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China.]

Dated:  March 22, 2018

*Daniel B. Pickard*, *Maureen E. Thorson*, and *Stephanie M.  Bell*, Wiley, Rein & Fielding, LLP, of Washington, DC, for the plaintiff Diamond Sawblades Manufacturers' Coalition.

*Gregory S. Menegaz*, *J. Kevin Horgan*, *Judith L. Holdsworth*, and *Alexandra H. Salzman*, deKeiffer & Horgan, PLLC, of  Washington, DC, for the consolidated plaintiffs Bosun Tools, Co., Ltd. and Bosun Tools Inc.

*Max F. Schutzman*, *Andrew B. Schroth*, *Dharmendra N. Choudhary*, and *Elaine F. Wang*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for the consolidated plaintiffs Weihai Xiangguang Mechanical Industrial Co., Ltd., Ehwa Diamond Industrial Co., Ltd., and General Tool, Inc.

*Lizbeth R. Levinson*, *Ronald L. Wisla*, and *Brittney R. McClain*, Kutak Rock LLP, of Washington, DC, for the consolidated plaintiffs Jiangsu Fengtai Diamond Tool Manufacture Co., Ltd., Jiangsu Fengtai Tools Co., Ltd., Chengdu Huifeng Diamond Tools Co., Ltd., Danyang Huachang Diamond Tools Manufacturing Co., Ltd., Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Hong Kong Hao Xin International Group Limited, Jiangsu Inter-China Group Corporation, Jiangsu Youhe Tool Manufacturer Co., Ltd., Orient Gain International Limited, Pantos Logistics (HK) Company Limited, Qingyuan Shangtai Diamond

Tools Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd., Wuhan Wanbang Laser Diamond Tools Co., and Zhejiang Wanli Tools Group Co., Ltd.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, *Jr.*, Assistant Director.  Of Counsel on the brief was *Amanda T. Lee*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Musgrave, Senior Judge: This opinion concerns the November 1, 2013, through October 31, 2014 period of review ("POR") of the antidumping duty order on diamond sawblades ("DSBs") and parts thereof from the People's Republic of China ("PRC").  *DSBs and Parts Thereof From the PRC*, 81 Fed. Reg. 38673 (June 14, 2016) ("*Final Results*"), Public Record Document ("PDoc") 408, and accompanying issues and decision memorandum, PDoc 389 (June 9, 2016) ("*IDM*"); *see also DSBs and Parts Thereof From the PRC*, 80 Fed. Reg. 75854 (Dec. 4, 2014) ("*Preliminary Results*"), PDoc 352, and accompanying decision memorandum thereto ("*PDM*"), PDoc 333. The following instituted separate lawsuits, subsequently consolidated, to contest aspects of those results as determined by the International Trade Administration, U.S. Department of Commerce ("Department" or "Commerce"): (1) plaintiff Diamond Sawblades Manufacturers' Coalition ("DSMC"); (2) consolidated plaintiffs consisting of Weihai Xiangguang Mechanical Industrial Co., Ltd. ("WXMI", an exporter and producer of subject merchandise from the PRC), Ehwa Diamond Industrial Co., Ltd. (WXMI's Korean affiliate), and General Tool, Inc. (collectively "Weihai"); (3) consolidated plaintiffs Jiangsu Fengtai Diamond Tool Manufacture Co., Ltd. and Jiangsu Fengtai Tools Co., Ltd. (collectively[1] "Jiangsu Fengtai" or "JF", exporters and/or producers

---

[1]  *I.e.*, with the support of the remaining-named PRC companies counseled above.  During
(continued...)

of subject merchandise); and (4) consolidated plaintiffs Bosun Tools Co., Ltd., an exporter and/or

producer of subject merchandise, and Bosun Tools Inc. (collectively "Bosun").

        Jurisdiction over the case is pursuant to 28 U.S.C. §1581(c), and the standard of

review thereon is to decide whether a final administrative determination is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law".   19 U.S.C.

§1516a(b)(1)(B)(i).  The parties' separate motions for judgment, pursuant to the court's Rule 56.2,

challenge these administrative determinations on the record: (1) deduction of irrecoverable value-

added tax ("VAT") from Jiangsu Fengtai and Weihai's export prices, (2) surrogate valuation of

nitrogen and oxygen, (3) surrogate valuation of labor, (4) calculation of surrogate truck freight, (5)

treatment of graphite plates as direct material rather than factory overhead, (6) selection of financial

statements for financial ratios, (7) denial of a request to rescind the review as to Weihai, (8)

valuation of self-produced and purchased DSB cores in the calculation of Weihai's normal value,

and (9) the margin for the separate rate respondents, as impacted by the foregoing.[2]  The case is being

remanded voluntarily, by request, and also in accordance with the following.

---

[1]  (...continued)
the review, Jiangsu Fengtai Diamond Tool Manufacture Co., Ltd., Jiangsu Fengtai Tools Co., Ltd.,
and Jiangsu Sawging Co., Ltd. were determined to be affiliated and consequently considered as a
single entity. *See* 80 Fed. Reg. at 75854.

[2]  Initially, Bosun also challenged Commerce's application of its differential pricing analysis,
arguing that that analysis and its application were contrary to the statute, improperly disclosed, and
reliant upon an allegedly improper statistical method, the Cohen's *d* test, *see* Bosun Br.at 13-21, but
as its reply brief does not address the defendant's response thereto, that count of Bosun's complaint
is therefore deemed abandoned.  *See*, *e.g.*, *United States v. Great American Insurance Co. of New
York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("arguments that are not appropriately developed in a
party's briefing may be deemed waived").

*Discussion*

I.  Voluntary Remand

Commerce voluntarily requests remand of the last two issues in light of the intervening remand order issued in *Diamond Sawblades Manufacturers' Coalition v. United States*, 41 CIT ___, 219 F. Supp. 3d 1368 (2017).  That case, which concerns the previous administrative review of DSBs from the PRC, remanded the issue of Weihai's cores' valuation methodology.  *See id.*; *see also Diamond Sawblades Manufacturers' Coalition v. United States*, 42 CIT ___, ___ WL ___ Slip Op. 18-26 (Mar. 22, 2018).  The case of *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("*SKF*") holds that the reviewing court has the discretion to grant a remand, if an agency requests it, without confessing error, in order to reconsider its previous position.  DSMC supports Commerce's request for remand and "agrees that Weihai's normal value calculation and, as necessary, the margin for the non-selected separate rate companies, should be reconsidered in light of the issues raised in DSMC's opening brief and reviewed herein."  DSMC Reply at 4.  Weihai's response brief targets the DSMC's arguments raised in the latter's 56.2 brief, but Weihai's reply brief is silent on the remand request.  Because the agency's request appears legitimate and substantial, issues (8) and (9) will therefore be, and hereby are, remanded to harmonize with Court No. 15-00164 (but, *nota bene* section IX *infra*).

II.  Deduction of Irrecoverable VAT

Jiangsu Fengtai, Weihai and Bosun challenge Commerce's determination with respect to Commerce's methodology for the deduction of "irrecoverable" VAT from the reported U.S. prices.  *See IDM* at 14.  They also challenge Commerce's specific deduction in this case.

Case 1:16-cv-00124-JAR   Document 77   Filed 03/22/18   Page 5 of 54

Consol. Court No. 16-00124                                                    Page 5

By way of background, an antidumping duty represents the amount by which the "normal value" ("NV") of subject merchandise exceeds its United States price ("USP"), which is typically either an export price ("EP") or a constructed export price ("CEP").  19 U.S.C. §1673.  In a market economy situation, NV is typically the price at which the foreign like product is sold or offered for sale for consumption in the exporting country.  19 U.S.C. §1677b(a)(1)(B).  When Commerce calculates USP, regardless of whether the proceeding concerns a market economy or non-market economy ("NME") situation the statute calls for deduction of "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States".  19 U.S.C. §1677a(c)(2)(B).

In applying these provisions, Commerce has sought tax neutrality when comparing NV with USP.  *See*, *e.g.*, *IDM* at 15.  It has also sought to avoid the "multiplier effect" in the determination of the margin.  Explaining what "multiplier effect" means by way of example concerning a market economy, the Court of Appeals for the Federal Circuit had this to say:

> Assume product A is sold in Japan for $100. The identical product is exported and sold in the U.S. for $90. The difference is $10, the amount by which the product is being dumped. Further assume a 10% VAT is imposed on the sale in Japan, but not on the export sale to the U.S. With the tax included, FMV[3] is $100 + 10%   $110. The similar calculation of USP, using the tax rate, is $90 + 10%   $99. The dumping margin, FMV-USP, is $11 ($110 - 99), rather than the $10 which is the actual amount of dumping. This mathematical peculiarity is known as the "multiplier effect."

*Federal-Mogul Corp. v. United States*, 63 F.3d 1572, 1576 (Fed. Cir. 1995).

The case clarified that while Congress had specifically rejected a proposed tax neutral approach to the problem, the most that can be inferred from the statute as it came into being at that

---

[3]  "FMV", *i.e.*, "foreign market value," became NV with passage of the Uruguay Round Agreements Act ("URAA").  *See* Pub L. 103-465 §224 (Dec. 8, 1994).

time is that Congress neither mandated nor precluded a tax-neutral approach to the  administration

of section 1677a.  *See id.* at 1579-80.  The Federal Circuit also noted that the easiest way to achieve

tax neutrality would be to subtract the VAT from the price actually paid in the home market, which

had been Commerce's approach to the problem in a number of cases prior to implementation of the

URAA.  *See id.* at 1576,  referencing *Zenith Electronics Corp. v. United States*, 10 CIT 268, 273 and

n.8, 633 F. Supp. 1382, 1386 and n.8 (1986).

      Two points are notable.  For one, the problem Commerce had considered in

*Federal-Mogul*, to repeat, was in the context of a market economy's VAT.  But in a non-market

economy ("NME") situation, Commerce must normally resort to determining NV on the basis of the

factors of production ("FOPs") for subject merchandise.  19 U.S.C. §1677b(c).  Stated differently,

the NV price in the NME home market is suspect.  Weihai also emphasizes here that Commerce's

historical position had been that 19 U.S.C. §1677a(c)(2)(B) does not apply in NME cases because

no reliable way existed to determine whether or not an export tax had been included in the price of

a product from an NME.  Either consideration leads to the second point: when comparing NV to

USP, avoidance of the multiplier effect, assuming that is desirable, is distinct from a tax-neutral

comparison.  The latter, obviously, is not the same as "tax-free."

      Recent cases have sustained Commerce's theoretical interpretation of the statute as

permitting the deduction from USP of irrecoverable VAT.  *See generally Aristocraft of America,*

*LLC, v. United States*, 41 CIT ___, 269 F. Supp. 3d 1316 (2017) ("*Aristocraft*").  The apparent

reason such cases have been instituted is that Commerce reconsidered how it would apply the NME

aspect of the antidumping statute in light of how the PRC's so-called "socialist market economy"

has been evolving.  *See Methodological Change for Implementation of Section 772(c)(2)(B) of the*

*Tariff Act of 1930, as Amended, in Certain NME Antidumping Proceedings*, 77 Fed. Reg. 36481

(June 19, 2012) ("*Methodological Change*").

A

The parties' challenges to Commerce's interpretation of 19 U.S.C. §1677a(c)(2)(B)

and 19 U.S.C. §1677(18)(A) raise arguments similar to those considered in other cases and do not

advance a different reason for invalidating Commerce's interpretation of the statute.

Jiangsu Fengtai begins by arguing that Commerce's interpretation is contrary to the

"plain" meaning of the statute and *Magnesium Corporation of America v. United States*, 166 F.3d

1364, 1370-71 (Fed. Cir. 1999) ("*Magnesium Corp.*"), which "prohibits" deduction from U.S. price

of not only export taxes duties and charges that may be imposed upon the exportation of merchandise

by NME countries but also the unrebated portion of internal VAT taxes.  Jiangsu Fengtai claims

these are "by definition" not a form of "export tax, duty or other charge imposed" by the PRC upon

export of the subject merchandise.  Jiangsu Fengtai 56.2 Br. at 7-12.  But, in upholding Commerce's

interpretation of section 1677a(c)(2)(B) in the context of the Russian Federation, *Magnesium Corp*.

only upheld that section 1677a requires export taxes to be deducted from USP if the export tax is

included in such price.  The decision does not limit or preclude Commerce from determining the

extent to which such taxes (or duties or other charges) are included in such price.

Nonetheless, Jiangsu Fengtai quotes *Magnesium Corp.*'s observations with respect

to USP to the effect that in a market economy Commerce can "presume" any tax imposed on

merchandise to be exported will be included in the USP of that merchandise and also that such a

presumption is "not available" when the merchandise is produced in an NME, in that "the price of

the merchandise does not reflect its fair value because the market does not operate on market

principles" and "no reliable way exists to determine whether or not an export tax has been included

in the price of a product from" an NME.  *Magnesium Corp.*, 166 F.3d at 1370.  To the extent those

observations reiterate Commerce's thinking with respect to NV (or rather, at the time, FMV), the

decision predates *Methodological Change*, which Commerce announced after notice and comment,

and which is entitled to *Chevron* deference. [4]  *E.g.*, *Aristocraft*, 41 CIT at ___, 269 F. Supp. 3d at

---

[4]  The observations also seem to conflate an NME's internal NV price with its USP, because if the latter is an agreed-upon, arm's length price, it is therefore a "market" price by definition, apart from the question of whether it is a "fair" price.  *Cf.* 19 U.S.C. §1677a.  In order to assist any post-decisional scrutiny of this opinion, the defendant provides further background as follows:

        Pursuant to 19 U.S.C. §1677a(c)(2)(B), when Commerce calculates export price, it deducts from its calculation any "export tax, duty or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States." Historically, Commerce did not apply section 1677a(c)(2)(B) to proceedings for non-market economies because "pervasive government intervention . . . precluded proper valuation" of those charges. *Methodological Change . . .* . Thus, previously, for non-market economy countries, Commerce did not deduct export expenses from export price, because "the actual amounts paid are an internal expense within an NME country." *Pure Magnesium and Alloy Magnesium from the Russian Federation*, 60 Fed. Reg. 16,440 (Dep't of Commerce Mar. 30, 1995) (final results admin. review) ("*Russian Magnesium*").

        The Federal Circuit sustained Commerce's practice in *Magnesium Corp. . . .* . Specifically, the Federal Circuit sustained Commerce's interpretation of 19 U.S.C. § 1677a(c)(2)(B) as not requiring Commerce, in the non-market economy context, to deduct export duties and costs in an non-market economy, given that "[b]y definition, in a non-market economy, the price of merchandise does not reflect its fair value because the market does not operate on market principles," and "no reliable way exists to determine whether or not an export tax has been included in the price of a product from a non-market economy." *Id.* at 1370.  It further explained that "the *nature* of the Russian economy *does not permit Commerce to determine* whether the export taxes imposed on the exported magnesium were actually included in the price of the magnesium as required by subsection 1677a(d)(2)(B)[,]" and thus it was reasonable for Commerce to determine that "[e]xport taxes must be treated as an intra-non-market economy expense *under these circumstances*, making it impossible to determine whether the actual cost of the export tax was included in the price at

(continued...)

1322; *Jacobi Carbons AB v. United States*, 41 CIT ___, ___, 222 F.Supp.3d 1159, 1186-94 (2017) ("*Jacobi Carbons*").

Jiangsu Fengtai next argues that "[i]nstead of affirmatively imposing a tax, charge or other duty as required by the statute upon the export of the subject merchandise, the government of [the PRC] in this case is not refunding previously paid internal VAT when the subject merchandise is exported." JF Br. at 14. This argument, however, essentially concedes the fact of unrefunded (*i.e.*, irrecoverable) VAT, which Commerce's methodology purports to address, and the record shows that Jiangsu Fangtai declared receipt of "rebate" upon exportation. At least

---

[4] (...continued)
which the magnesium was sold in the United States." *Id*. at 1371 (emphases added).

After *Russian Magnesium*, and given the nature of the [evolving PRC] economy, Commerce initially found that it could not determine whether [PRC] export duties and costs were actually included in the price of the merchandise. In 2012, in recognition that the present-day [PRC] economy is sufficiently dissimilar from Soviet-style economies such that taxes paid by companies in [the PRC] can be identified and measured, Commerce changed its methodology for antidumping duty proceedings involving merchandise from [the PRC], and determined to deduct any such charges that were imposed, "including VAT that is not fully refunded upon exportation." *Id*. at 36,482. Commerce also determined that, "in many instances, the export tax, VAT, duty, or other charge will be a fixed percentage of the price. In such cases, the Department will adjust the export price or constructed export price downward by the same percentage." *Id*. at 36,483.

Commerce explained that "[a]lthough [Commerce does] not know how individual companies in [the PRC and Vietnam] set prices, we do know that the government taxes a portion of companies' sales receipts," and Commerce "can measure a transfer of funds between certain [non-market economies] and companies therein, regardless of the direction the money flows." *Id*. (citation omitted). "Given that, and given that we know how much respondent companies receive for the [United States] sale, we have determined it appropriate to take taxes into account, as directed by the statute." *Id*.

Def's Resp. at 31-33 (bracketing added in part; italics in original). *See also infra* note 5.

conceptually, the unrefunded or irrecoverable VAT represents what must, of necessity, have been

a cost that must, in turn, be passed along to the ultimate purchaser in the export price. *See*, *e.g.*,

*Aristocraft*, 41 CIT at ___, 269 F. Supp 3d at 1324-25.

      Bosun repeats that VAT is not "imposed" by the PRC "on the exportation of subject

merchandise to the United States" as required by the statute, and that Commerce itself previously

rejected the rationale of the new VAT adjustment methodology to compensate for a domestic tax

imposed on the acquisition of inputs in the PRC and also to ensure the cost is captured in the

calculation, which *Magnesium Corp.* had sustained.   Bosun Br. at 10-12, referencing *Globe*

*Metallurgical, Inc. v. United States*, 35 CIT ___, ___, 781 F. Supp. 2d 1340, 1346-47 (2011).   But

*Juancheng Kangtai Chemical Co., Ltd. v. United States*, 41 CIT ___, Slip Op. 17-3 at 27-28, (Jan.

19, 2017) ("*Juancheng Kangtai II*"), among others, has rejected this argument, and this court

perceives no reason to reach a contrary conclusion here.

      Weihai argues the statute's meaning is "plain", as is the meaning of "exportation" in

international commerce and U.S. Customs and Border Protection ("Customs") regulations.   Weihai

Reply at 26.   Elaborating, Weihai contends that the statutory phrase "other charge" is circumscribed,

*ejusdem generis*, by "export tax" and "export duty", and that Commerce is only authorized to adjust

USP only when there is an "amount" that is "imposed on the exportation of the subject merchandise"

and is "included in the export price", *id*. at 27, and that "the statute specifically requires Commerce

to make a finding that a 'tax, duty or other charge' equivalent to a fixed percentage of the FOB value

of the exported merchandise was '*imposed by the exporting country*'", *id*. at 37 (Weihai's emphasis).

Likewise, in its criticism of *Juancheng Kangtai Chemical Co., Ltd. v. United States*, 39 CIT ___,

Slip Op. 15-93 (Aug. 21, 2015) ("*Juancheng Kangtai I*") , Weihei contends Commerce must make

a specific finding consistent with *China Manufacturers Alliance v. United States*, 41 CIT \_\_\_, \_\_\_,

205 F. Supp. 3d 1325, 1346-49 (2017), that "irrecoverable VAT itself was actually imposed by [the

PRC] on the export of subject merchandise as required by the statute." *Id.* at 35 (emphasis omitted).

Weihai's reading of 19 U.S.C. §1677a(c)(2)(B) and the record is too narrow.  In the

first place, the statute broadly asks whether there has been included in USP "any export tax, duty,

or other charge imposed by the exporting country *on* the exportation of the subject merchandise to

the United States".  Commerce's reading of "on" is not "by reason of" exportation, it is essentially,

and straightforwardly, whether there *is* ("exists") "any export tax, duty, or other charge imposed by

the exporting country" included in USP at the time of exportation.  *Cf. Magnesium Corp.*, *supra.*

To "impose" means "[t]o charge; impute"; "[t]o subject (one) *to* a charge, penalty or the like"; "[t]o

lay as a charge, burden, tax, duty, obligation, command, penalty, etc." *Webster's New International*

*Dictionary of the English Language*, *Unabridged*, p. 1251 (2nd ed. 1956) (italics in original).  *See*

*also*, *e.g.*, *Jacobi Carbons*, 41 CIT at \_\_\_ , 222 F. Supp. 3d at 1188 (lexicographical definition of

"imposed").  The satisfaction of any such imposition is not necessarily concurrent with the act of

imposition, which may occur at any time, and the vagueness of the statutory language neither

precludes nor requires such interpretation.  *See*, *e.g.*, *Aristocraft*, 41 CIT at \_\_\_, 269 F. Supp. 3d at

1324-25; *Jacobi Carbons*, 41 CIT at \_\_\_, 222 F. Supp. 3d at 1187-88.

In the second place, it cannot reasonably be argued on this record, notwithstanding

*China Manufacturers Alliance*, that VAT was not "imposed" in contravention not only of Weihai's

own statements to that effect, *e.g.*, with respect to its purchases of inputs for subject merchandise or

the subject merchandise itself, but in particular with respect to PRC law, which provides that at the

time of export of subject merchandise the VAT rebate is calculated based upon the full export value

of the subject merchandise at the time of export.

Commerce interpreted Weihai's submissions of PRC law to the effect, not only, that

exportation itself is what gives rise to the irrecoverable VAT "imposed" by the PRC on the process

of manufacture and on the sale of subject merchandise, but also, that the "irrecoverable" amount of

VAT is to be calculated by reference to the full FOB export value of subject merchandise.  That

interpretation is not inherently unreasonable, and Weihai's nuanced interpretation does not render

it so, *i.e.*, the implicit argument being that the statute requires some form of explicit "imposition"

that must simultaneously coincide with exportation, which, as discussed, is not the only reasonably

possible interpretation of the statute.  Accordingly, Commerce's interpretation of 19 U.S.C. §

1677a(c)(2)(B) and  §1677(18)(A), in the context of this review, will be, and hereby is, sustained.

B

That does not, however, settle the methodological dispute.  In the *Final Results*,

Commerce described its methodology as involving two basic steps: "(1) determining the amount of

irrecoverable VAT on subject merchandise, and (2) reducing U.S. price by the amount determined

in step one."  *IDM* at 15.  Commerce further explained that the definition of irrecoverable VAT is

"explicitly defined in [PRC] tax regulations" and amounts to the following: (1) the free-on-board

value of the exported good, applied to the difference between; (2) the standard VAT levy rate; and

(3) the VAT rebate rate applied to exported goods.  *Id.* at 16.  "The first variable, export value, is

unique to each respondent[,] while the rates in (2) and (3), as well as the formula for determining

irrecoverable VAT, are each explicitly set forth in [PRC] law and regulation."  *Id*.  Hence, because

Jiangsu Fengtai and Weihai reported the standard VAT levy on the subject merchandise as 17% and

the VAT rebate rate for the subject merchandise as 9%, the methodology called for removing from

USP an amount calculated from the 8% difference between those rates as "applied to the export sales

prices (*i.e.*, U.S. price net of international movement expenses), consistent with the definition of

irrecoverable VAT under [PRC] tax law and regulation."  *Id.* at 15-16.

        Bosun argues the method for the deduction is unsupported by substantial evidence

on the record.  DSMC counters that the deduction was premised "on the information the Jiangsu

Fengtai Single Entity and Weihai placed on the record of this review, which provides an independent

basis demonstrating that the PRC government imposes taxes that can be identified and measured",

echoing the *IDM* and the defendant's response. DSMC Resp. at 33, quoting *IDM* at 17.  Weihai

responds it is "unclear" what that "independent basis" is, but it is not unclear to the court.  *See supra*.

        Weihai argues that under PRC regulations the rate of VAT on exported goods is 0%,

and that 17% VAT was merely paid on the purchase of "inputs."  It contends that a "formulaic rate-

based computation resulting in an 8% VAT deduction from [USP]" is unlawful because the statute

authorizes deduction for "the amount" of "any export tax, duty or other charge", *etc.*, that is included

in the export price and

> it is axiomatic that an adjustment based upon the difference between the VAT rates
> paid (on purchased inputs) and refunded (on export of finished goods) being applied
> to a common value base (FOB price of finished goods sold) is not the same as the
> actual amount paid when the applicable input VAT rate and refund rate are applied
> to two different value bases, *i.e.*, the value of inputs (17%) and the value of finished
> goods (9%), respectively.

Weihai Reply at 29 (emphasis removed).  Weihai argues that in the instant case Commerce simply

applied the irrecoverable VAT formula provided by PRC law as follows:

> Irrecoverable VAT     (FOB export value) multiplied by (standard VAT levy rate minus VAT rebate applicable to exported goods)     (FOB export value) * (17% - 9%)     FOB * 8%.

*Id*. at 32.

But as the defendant's response points out, "Commerce reasonably determined, based on unambiguous record evidence, that Jiangsu Fengtai and Weihai paid the standard [PRC] VAT rate on [their] purchas[es] *of subject merchandise*, and then received a rebate of nine percent." Def's Resp. at 39 (italics added). Jiangsu Fengtai's and Weihai's replies do not dispute this point, although Jiangsu Fengtai contends, nonetheless, that the administrative record establishes that no part of the internal VAT, regardless of whether it is the refunded or unrefunded portion, is included in the price paid by the U.S. customer for the subject merchandise. JF Br. at 14, referencing JF's Section A Resp. at Ex. A-14, CDoc 70. *Methodological Change* indeed indicates that "included in the price" of subject merchandise from the PRC necessitates inquiry into whether the price is reported on a "gross (i.e. inclusive) or net (i.e. exclusive) of tax" basis, 77 Fed. Reg. at 36483, but Commerce implicitly concluded Jiangsu Fengtai's prices were reported on a gross basis, *see IDM* at 14-17. The court perceives no reason, among the papers submitted, for interfering with that conclusion, as the burden is on the respondent to create clarity for the record. *See, e.g., QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("*QVD Food*") (holding that "the burden of creating an adequate record lies with [interested parties] and not with Commerce"); *NTN Bearing Corp. of Am. v. United States*, 997 F.2d 1453, 1458-59 (Fed. Cir. 1993) (same).

The parties try to make further hay over whether Commerce's methodology was based on an "amount" or a "ratio", *see Federal Mogul*, *supra*, but the amount of any tax that is expressed by law as a fractional term will necessarily involve application of the relevant ratio (*i.e.*, by and

through calculation) to determine the relevant "amount" of the tax. Indeed, it is difficult to conceive

of how one could be expected to arrive at "the amount" of VAT applicable to a particular transaction

otherwise than through application of "the formula" that a particular VAT tax would call for. *See*,

*e.g.*, *IDM* at 14 ("we continue to apply our preliminary formula to adjust the VAT to deduct from

the reported U.S. prices *an amount* for irrecoverable VAT") (italics added). More to the point: the

multiplier effect that would be of concern in a market economy situation, as expressed in *Federal-*

*Mogul*, normally cannot be concluded relevant to an NME comparison of NV with USP, due to

uncertainty over cost or pricing structures within the NME[5] (which uncertainty does not, of course,

extend to certainty established by law, *e.g.*, the rate or amount of taxation on those transactions).

The above "formulaic" expression of PRC law, and its application by Commerce in

the context of this proceeding, is in accordance with Weihai's reporting thereof and the PRC's

regulation on the subject. It is also in accordance with the agency's methodology, as the defendant

and DSMC contend. *See Methodological Change.* Commerce concluded that the unrefunded

amount of VAT that must be, or have been, "imposed" on "the exportation of the subject

merchandise to the United States" is the amount or value of VAT that the PRC itself has indicated

to be the "irrecoverable" amount of its VAT program. And despite Weihai's argument, this is not

a presumption, it is a factual inference from the record, and substantial evidence of record supports

---

[5] *See Methodological Change*, 77 Fed. Reg. at 36483 ("when the Department evaluates whether a tax is included in the price of an NME export sale, it cannot take into consideration the same assumptions as those taken into account when performing a similar type of evaluation for a market economy sale, which does operate in accordance with market principles of cost or pricing structures[;] . . . it is not an issue of price formation (*i.e.*, whether the seller considers tax when forming price) because that is a market economy concept which is inapplicable by the very definition of an NME").

it.  To conclude from the record that the amount of irrecoverable VAT was "something less" and/or "capped" by reference to what had purportedly been paid on inputs earlier in production would be to ignore the actual evidence of record and the apparent manner in which the PRC itself operates its VAT program.  *See*, *e.g.*, Def's Resp. at 39, *supra*.

Expanding on that point, several observations are worthwhile.  First, as indicated, the PRC formula reveals that the VAT rate in that home market is 17% and for exports of subject merchandise the VAT rebate is 9% of the full export value thereof, an obvious difference of 8%, and Commerce found this "net" remainder to be, or to equate to, the amount of "irrecoverable" VAT that is defined in PRC law.  "It is VAT paid on inputs and raw materials (used in the production of exports) that is non-refundable and, therefore, a cost." *IDM* at 15.  Of course, the 8% amount of irrecoverable VAT may seem difficult to square with the "actual" amount of 17% VAT respondents claim as having been paid on "inputs," because the 9% VAT rebate amount is calculated by reference to the full FOB export value of the good, not only (or merely) by reference to the full amount of VAT that purportedly would have been paid on "inputs," but, as mentioned, the defendant has pointed out that in the context of this proceeding "inputs" can mean subject merchandise in any event.

Second, the formula reflects that in the context of export, the internal VAT credit that an exporter or producer paid on inputs, and uses to net[6] the amount owed on a sale of the merchandise, is a *separate* consideration from the VAT rebate amount that the PRC calculates by reference to the full FOB export price of subject merchandise due to the *implicit* amount of VAT attributable to that event.  In other words, by tethering the rebate to the full export value of the

---

[6] This being merely presumptive in an NME situation, since monetary units are fungible.

merchandise, the PRC regulation essentially declares that the PRC is foregoing an 8% amount of VAT calculated by reference to the full export value of merchandise, notwithstanding the claim of 0% VAT "imposed" on subject merchandise upon its exportation.  If the irrecoverable VAT of 8% of the full FOB export value of the subject merchandise is not the remainder of a 17% VAT that has been, or is, implicitly imposed on such merchandise, then it still bears little relationship, if any, to the 17% VAT imposed on the purchase of inputs used in production, because regardless of any "rolling" basis used to account for VAT paid and VAT rebated, the amount of both rebate and irrecoverable VAT must still be calculated based upon the full export value of the subject merchandise.[7]  That irrecoverable VAT, thus, represents an amount that must necessarily be included in the export price, because, as mentioned, it is that differential, between the full amount that the PRC government would otherwise receive, and the amount of VAT that the exporter actually receives in rebate, that the PRC itself deems, as Commerce found, "irrecoverable," and which amount remains, at the time of export, an "imposition" on the value of the subject merchandise, and which therefore requires adjustment to USP.  It is the functional equivalent of a cost.

        Commerce's methodological resolution of these types of VAT problems has been held to require at least further clarity of late,[8] but as articulated here by the defendant, Commerce's methodological approach is based directly on the PRC's own law and regulation.  In this matter,

---

        [7]  *Cf.*, *e.g.*, JF Br. at 14 (the PRC government "in this case is not refunding previously paid internal VAT when the subject merchandise is exported").

        [8]  *Cf. e.g.*, *Aristocraft*, *supra*, *Jacobi Carbons*, *supra*, *with*, *e.g.*, *U.S. Steel Group v. United States*, 225 F.3d 1284 (Fed. Cir. 2000) (judicial disagreement over "total expenses" in 19 U.S.C. §1677a(f)(2)(C) resolved by *Chevron* deference to agency's reasonable interpretation and computation thereof).

Commerce's application thereof appears reasonable and permissible, it has apparently been applied consistently,[9] it is not unreasonable *per se*, and it furthers the aim of the antidumping statute.  In arguing for this court to conclude otherwise, the respondents are essentially asking for substitution of judgment on a conclusion or finding from the record that is within Commerce's domain, which is outside the standard of judicial review.  Commerce requests deference to its reasonable interpretation of the statute and of the record and its methodology, and current law on the subject supports that request.  *See, e.g.*, *Jacobi Carbons*, 41 CIT at ___, 222 F. Supp. 3d at 1186.  For the foregoing reasons, this court is unpersuaded by the respondents' challenges on this issue.

IV.  Reliance Upon Contemporaneous Thai Import Data

Among the FOPs requiring surrogate values ("SVs") during the review were nitrogen and oxygen.  For the *Final Results* Commerce calculated those SVs based on the Global Trade Atlas ("GTA") data for headings 2804.30, and 2804.40 of the Thai Harmonized Tariff Schedule ("HTS") upon determining that those data were contemporaneous with the POR, represented broad-market averages free of taxes and duties, came from the primary surrogate country, and were the best available information.  *IDM* at 49-50.  Jiangsu Fengtai agrees with use of GTA statistics for the Thai HTS headings 2804.30 and 2804.40 for valuing nitrogen and oxygen, respectively, but it argues Commerce should use the Thai import statistics from the fourth administrative review because the instant review data are aberrational in comparison therewith insofar as the total quantity of imports in the Thai GTA data are "commercially and statistically insignificant" in comparison with its own consumption of nitrogen and oxygen.  Jiangsu Fengtai Br. at 27-28.

[9]  *See, e.g.*, *Multilayered Wood Flooring from the PRC*, 79 Fed. Reg. 26712 (May 9, 2014) and accompanying I&D Memo at cmt. 3.

The defendant contends that in order to exclude an SV, interested parties must provide specific evidence showing it to be aberrational.[10]  Commerce explained in the *Final Results* that such a determination does not involve comparing the volume of imports in the import data to the volume of the input a respondent purchased or of non-identical inputs but rather comparing the total import volumes of potential surrogate countries to one another.  *See IDM* at 50.  The defendant also emphasizes that Commerce need not replicate the respondent's actual experience.  Def's Resp. at 43, referencing *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1378 (Fed. Cir. 1999).

"This court's duty is 'not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information.'" *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011), quoting *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006).  The appropriate comparison to make would have been to compare the GTA import data with Thai or other surrogate country data in general.  *See Trust Chemical Co. Ltd. v. United States*, 35 CIT ___, ___, 791 F. Supp. 2d 1257, 1265 (2011) (argument that total import data were too small held unavailing in absence of evidence that WTA volume data were only a small fraction of India's domestic consumption); *see also Shakeproof Assembly Components Div. of*

---

[10]  Def's Resp. at 42, referencing: *Carbazole Violet Pigment 23 from the PRC*, 75 Fed. Reg. 36630 (June 28, 2010) (final results) and accompanying issues and decision memorandum (all such memoranda except for *IDM* hereinafter "I&D Memo") cmt. 4; *Certain Hot-Rolled Carbon Steel Flat Products From Romania*, 70 Fed. Reg. 34448 (June 14, 2005) (final results) and accompanying I&D Memo cmt. 2 ("we reviewed the allegations regarding surrogate values as presented by the interested parties and decided whether the parties had provided sufficient evidence to merit further consideration"); *Polyethylene Retail Carrier Bags from the PRC*, 73 Fed. Reg. 14216 (Mar. 17, 2008) (final results) and accompanying I&D Memo cmt. 6 ("[w]e find that the burden is on the respondents to demonstrate that the Indian import statistics are in fact aberrational").

*Illinois Tool Works, Inc. v. United States*, 23 CIT 479, 485, 59 F. Supp. 2d 1354, 1360 (1999) (Commerce's "administrative practice with respect to aberrational data is 'to disregard small-quantity import data when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product *from other countries*'") (citation omitted; italics added).   Jiangsu Fengtai did not provide such specific evidence for the record, and, as mentioned, the burden of creating an adequate record, including surrogate value information, lies with the interested parties. *See, e.g., QVD Food*, *supra*; *NTN Bearing Corp.*, *supra*.

Jiangsu Fengtai's reliance on *Xinjiamei Furniture* and *Juancheng Kangtai I* is similarly unavailing.  *See Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, 37 CIT ___, Slip Op. 13-30 (Mar. 11, 2013); *Juancheng Kangtai I, supra.*   In *Xinjiamei Furniture*, the respondent, arguing that the Indian import data were aberrational, placed non-Indian data on the record including Brazilian, Northern European data and world export market "benchmark" prices*.* The court ordered Commerce to take the Brazilian, Northern European and world export market data into account on remand.   37 CIT at ___, Slip Op. 13-30 at 16.   Similarly, in *Juancheng Kangtai I,* the respondent argued that the Philippine import data was aberrational compared with other surrogate country data, 39 CIT at ___, Slip Op. 15-93 at 51-52. Here, however, Jiangsu Fengtai provided no such comparative data.

Jiangsu Fengtai fights an uphill battle in its reply.  It condemns the *Final Results* as providing no valid reasons for Commerce's current policy and argues that *Juancheng Kangtai I* found unreasonable the assumption that the small amount of Thai import data in that case could possibly reflect the "commercial reality" of that respondent.  Jiangsu Fengtai Reply at 15, quoting Slip Op. 15-93 at 54.  *Accord*, *Baoding Mantong Fine Chemistry Co. v. United States*, 41 CIT ___,

Slip Op. 17-44 at 37 (Apr. 19, 2017) (noting 604 metric tons of Indonesian import data for steam coal "was far less than even Baoding Mantong's own consumption of 1,037 metric tons" and remanding for reconsideration). However, the Federal Circuit in *Nan Ya Plastics* reviewed the legal requirements of "commercial reality" and "accurate" and concluded that "[w]hen Congress directs the agency to measure pricing behavior and otherwise execute its duties in a particular manner, Commerce need not examine the economic or commercial reality of the parties generally, or of the industry more generally, in some broader sense." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), referencing *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009).

      "Our case law and the statute thus teach that a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Id*. (citations omitted). For its *Final Results*, Commerce could not determine aberrance with respect to the Thai GTA data for headings 2804.30, and 2804.40 in the absence of other surrogate country data of record against which those data could be examined in relief. Its explanation, that it does not compare the volume of imports in the import data to the volume of the input a respondent purchased or non-identical inputs, and that it need not replicate the respondent's actual experience, comports with *Nan Ya*'s summation, and is thus in accordance with law. Jiangsu Fengtai's arguments do not persuade otherwise.

## V.  Valuation of Labor Using
## NSO 2014 Labor Force Survey

      Weihai and Bosun also challenge Commerce's surrogate valuation of labor. Commerce's preferred method of valuing the labor FOPs is to use industry-specific data from the

primary surrogate country published in Chapter 6A of the International Labor Organization ("ILO")

Yearbook of Labor Statistics when available, and otherwise to use industry-specific labor wage rate

data from the primary surrogate country.   *See*, *e.g.*, *Ad Hoc Shrimp Trade Action Committee v.

United States*, 41 CIT ___, ___, 219 F. Supp. 3d 1286, 1291 (2017); *see also IDM* at 47;

*Antidumping Methodologies in Proceedings Involving Non Market Economies*: *Valuing the Factor

of Production: Labor*, 76 Fed. Reg. 36092, 36093 (June 21, 2011) ("*Labor Methodologies*").   For

this administrative review, ILO Chapter 6A data for Thailand were not on the record.  *IDM* at 47.

For valuing labor, Weihai proposed industry-specific labor cost data published in the

Industrial Census report (2011) of the National Statistical Office ("NSO") of the Thai government.

*See* Weihai Prelim SVs (July 16, 2015), PDoc 202, at Ex. 6. The petitioners proposed reliance upon

general manufacturing labor cost data published quarterly in the NSO Labor Force Survey report

(2014).  *See* Pets' 2nd SVs (Nov. 2, 2015), PDoc 307.   Commerce preliminarily valued labor using

the latter as it is manufacturing-specific data contemporaneous with the POR.  *PDM* at 22-23.

In their administrative case briefs, Weihai and Bosun argued that those NSO data

were not specific enough, and that Commerce should instead rely on data from the 2011 Industrial

Census of the NSO, as those data were specific to the manufacture of tools/hardware, including

circular sawblades, and could be adjusted to reflect inflation.  Weihai's Case Br. at 24-38; Bosun's

Case Br. at 20-21.  Specifically, Weihai argued that the faster-than-inflation rate of increase in Thai

wages in general from 2011 to the POR was irrelevant to the DSB industry and accordingly

presented no bar to the use of the less-contemporaneous 2011 Industrial Census data, as the agency

could simply inflate those data using the Consumer Price Index ("CPI").  Weihai's Case Br. at 30-32,

36-38.  Weihai also argued that contrary to the agency's conclusion in a prior review the Industrial

Census data comprehensively accounted for indirect labor costs.  *Id*. at 32-36.

        In the final determination, Commerce continued to rely on the 2014 Labor Force

Survey data.  *IDM* at 46-48.  Commerce found those data to satisfy its requirements of being industry

specific, publicly available, representative of a broad market average, tax- and duty-exclusive,

contemporaneous with the POR, and therefore more compelling than the 2011 data.  *See id*. at 46.

Its choice of the 2014 Labor Force Survey data was also the result of comparing the direct and

indirect labor cost[11] elements in both the 2011 Industrial Census and the 2014 Labor Force Survey

data sets with the same elements described in the ILO Chapter 6A definitions thereof, which led

Commerce to determine that the 2011 Industrial Census data were not more detailed than the 2014

Labor Force Survey data in terms of matching categories of labor costs specified in the ILO Chapter

6A labor data.  *Id*. at 47-48.

        Commerce explained that the ILO Chapter 6A data were comprised of: (1)

compensation of employees, (2) employers' expenditure for vocational training and welfare services

(*e.g.*, training), (3) the cost of recruitment and other miscellaneous items (*e.g.*, work clothes, food,

housing), and (4) taxes.  *IDM* at 47.  Commerce found that the 2014 data included cash for average

wage, bonus, overtime, and other income, as well as in-kind compensation for food, clothes, housing,

and others, and thus included both direct compensation and bonuses as well as indirect compensation

(employee pension, benefits, and work training).  *Id.*  By contrast, Commerce found that while the

2011 data included wages, salaries, overtime bonus, fringe benefits (medical care, others), and

---

[11]  Indirect labor costs are items such as employee pension, benefits, and worker training, as opposed to direct compensation and bonuses.  *See Labor Methodologies*, 76 Fed. Reg. at 36093.

employer's contribution to social security (and thus facially included both direct compensation and indirect compensation, *i.e.*, fringe benefits), it also determined there was "uncertainty" over the 2011 data concerning whether work clothes, food, and housing were included in fringe benefits because the 2011 data only categorized fringe benefits as "Medical care" and "Others." *Id.* at 47.[12]

   Commerce also concluded that even if the 2011 data were more specific, they were not susceptible to accurate inflation using the standard CPI inflator, because wages in Thailand increased by a far greater percentage from 2011 to the POR than did the CPI. *Id.* at 48. Commerce thus reiterated that the standard CPI inflator would not lead to accurate results and that the 2011 data were unreliable even if they were arguably more specific. *See id.* at 46.

A

   Here, Bosun and Weihai both contend that Commerce's choice of using the 2014 data is not supported by substantial evidence and that Commerce should have chosen the 2011 data due to its greater specificity. Bosun Br. at 6-9; Weihai Br. at 32-37. Weihai, echoed by Bosun, argues Commerce's "uncertainty" finding concerning the 2011 data was "self-created." *E.g.*, Weihai Br. at 35. Bosun also contends Commerce persists in "misunderstand[ing]" a material difference in the terms of scope of the 2011 data and the 2014 data. *See* Def's Resp. at 46-49.

---

  [12] More precisely, Commerce explained that although the Appendix B of the 2011 Industrial Census data stated that fringe benefits included "food, beverages, lodgings, rent, medical care, transportation recreational and entertainment services, etc.," the 2011 Industrial Census data categorized fringe benefits only as "Medical care" and "Others," and that the data did not specify whether work clothes, food, and housing were included in the "Others" category of fringe benefits. *IDM* at 47. Therefore, the defendant elaborates, Commerce could not discern whether these specific types of fringe benefits were in fact included in the "Others" category of fringe benefits, whereas the 2014 Labor Force Survey data better reflected the full spectrum of labor (*i.e.*, fully loaded, direct and indirect) costs expressed within the ILO Chapter 6A data. Def's Resp at 48, referencing *id.* at 47.

Both argue the 2014 NSO Labor Survey data are too broad in the sense that they cover the entire manufacturing sector, whereas the 2011 NSO Industrial Census data are specific to the manufacture of saws and saw blades, including circular saw blades and chainsaw blades.  *E.g*, Bosun Reply at 2, referencing PDoc 202 at Ex. 6.  Relying on cases that have emphasized the importance of product specificity in the determination of best available information, Bosun argues that such importance extends to specificity determinations on the labor FOP,[13] and that Commerce specifically found the same 2011 Industrial Census data superior to the general manufacturing labor rate in *Drawn Stainless Steel Sinks From the PRC*, 80 Fed. Reg. 69644 (Nov. 20, 2015) (final 2012-14 rev. results; *see* accompanying I&D Memo at cmt. 12), and *Drawn Stainless Steel Sinks from the PRC*, 81 Fed. Reg. 29528 (May 12, 2016) (*inter alia* prelim. 2014-15 rev. results).

Regarding Commerce's position that it could not ascertain whether the 2011 Industrial Census category for "fringe benefits" included clothes, food, and housing, *see IDM* at 48, Bosun emphasizes that the source documentation states that "*all payments* in addition to wages and salaries" are included in fringe benefits and elaborates "fringe benefits" as "all payments in addition to wages or salaries paid to employees such as food, beverages, lodgings, rent, medical care, transportation recreational and entertainment services, *etc*." and also that "[p]ayment might be in cash or in kind."  *See* Weihai Initial SVs (July 16, 2015) at Ex. 6 (Bosun's italics); PDocs 202-03. *Id*.  Bosun points out that the source documentation specifically lists examples of fringe benefits to include food and lodging but also covers all additional payments; therefore, if workers received

---

[13] Bosun Reply at 2-3, referencing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014), *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010), and *Taian Ziyang Food Co. v. United States*, 35 CIT ___, ___, 783 F. Supp. 2d 1292, 1330 (2011).

clothing, food, and housing benefits, then it is included in the 2011 Industrial Census rate and it is "wholly unreasonable" for Commerce to question whether clothing, food, and housing are missing from the 2011 labor rate.  Bosun thus argues that Commerce could not reasonably determine the 2011 Industrial Census data did not fully cover all labor expenses as do the 2014 data.

For its part, Weihai contends that it "debunked" Commerce's implication that the 2011 Industrial Census data contained only direct labor costs, and also that it established that the 2014 data contained both direct and indirect costs by demonstrating, *viz*., that while the 2011 Industrial Census data encompass all of the elements of direct and indirect labor cost, the 2014 Labor Survey report indisputably does not include the critical indirect labor cost element "employer's contribution to social security."  Weihai Br. at 34-35.  Weihai argues both the defendant and DSMC implicitly concede that the 2014 data is incomplete and not representative of a fully loaded labor cost even of the generalized manufacturing sector, because given the omission "employer's contribution to social security" they failed to argue or show how the 2014 Labor Force Survey data were "comprehensive."  Weihai Reply at 16.

Furthermore, Weihai contends, Commerce erred because a certain letter Weihai obtain from NSO for the record clarified that the 2011 Industrial Census[14] and the 2014 Quarterly Labor Force Survey data were materially different in terms of scope and data collection methodology and, citing to its 2011 Labor Survey report data, NSO "affirmed that the 2011 NSO Industrial Census data, notwithstanding [their] lack of contemporaneity, w[ere] more reliable and accurate for valuing

---

[14]   Weihai's letter sought clarification with respect to  the 2011 Labor Force surveys and the "2012" Industrial Census data.  *See* Weihai Second SV Submission (Nov. 2, 2015) at Ex. 4B, PDoc 298.  The latter are here presumed to equate to references herein to "2011 Industrial Census data".

labor cost in the Thai manufacturing sector." Weihai Reply at 18.  *See* Weihai Br. at 46.  Weihai and

Bosun thus both argue that Commerce's "sole" rationale for preferring the 2014 Labor Survey data

is on the basis of contemporaneity.  *See* Bosun Br. at 9; Weihai Br. at 37.

           Even if that were the case, the court has previously upheld Commerce's preference

for utilizing surrogate values that are contemporaneous with the period of review.  *See Shakeproof*,

30 CIT 1173, 1177-78 (2006), *aff'd*, 228 Fed Appx. 1001 (Fed. Cir. 2007) ("Commerce's reliance

on valuation information from within that specific time period is clearly an appropriate means of

fulfilling [its] statutory directive.").  In any event, Commerce's determination did not rest upon

contemporaneity alone, and the defendant agrees as to the "material differences" between the two

data sets that Weihai concedes: Commerce "was unable to rely on the NSO clarification letter"

because, "although the letter explained the difference between the 2011 Labor Force Survey and the

2011 Industrial Census data, it did not provide an explanation for the difference between the two sets

of data that Commerce had on its record -- that is, the difference in methodology between the 2011

Industrial Census data and the 2014 Labor Force Survey data." Def's Resp. at 49.  The defendant

thus contends Weihai's argument is directly contradicted by record evidence.

           Weihai's reply, contending that the differences between the two NSO labor cost

databases described in the NSO clarification letter are not limited to the 2011 data but are with

regard to "all" of the Labor Survey reports including those issued during the POR, does not address

the entirety of the defendant's (and Commerce's) point.  Be that as it may, the NSO letter is mere

opinion, albeit an official one, and it is not dispositive as to which of the two sets of data Commerce

could choose as the best information available on the record.  Commerce's position is that although

the letter explained the difference between the 2011 Labor Force Survey and the 2011 Industrial

Census data, it did not provide an explanation for the difference between the two sets of data that

Commerce had on its record, *i.e.*, the difference in methodology between the 2011 Industrial Census

data and the 2014 Labor Force Survey data.  *IDM* at 48.  Commerce's explanation is not inherently

unreasonable.

B

Nonetheless, Weihai argues Commerce's finding that the 2011 Industrial Census data

"cannot reasonably reflect the labor cost, even after the adjustment for inflation" is erroneous

because Commerce has impermissibly conflated two very different databases. Weihai Br. at 36.

DSMC's response is that "the 2011 data could not be accurately inflated using the CPI, because Thai

labor costs rose between 2011 and the POR by a far greater rate than the CPI",  "[n]or could the

agency reasonably have simply assumed that the 2011 data could be accurately inflated using the

CPI, particularly given that, as Weihai itself concedes, Thai labor costs grew hugely between

2011-2014."  DSMC Br. at 36-37, referencing Weihai's Br. at 36 (stating that the Thai minimum

wage grew by 45% between 2011-2014).  Weihai contends that it "debunked" these arguments in

its opening brief and that DSMC is misconstruing its position, which is that while there was a

substantial increase in the average labor cost for manufacturing labor between 2011 and 2014, this

was attributable to a 45% enhancement in the Thai minimum wages during this period, and "the

enhanced Thai wage of 300 Baht/day (*i.e.* 37.5 Baht/hr) does not affect the substantially higher labor

cost of 61.39 Baht/Hr for the industry-specific Code 25939 in the NSO Industrial Census report."

Weihai Reply at 13-14, referencing Weihai Br. at 36.

In other words, Weihai contends, the effect of enhancement in the minimum Thai

wage rate was limited to those manufacturing sectors where the prevailing wage or labor rates were

below 300 Baht/day or 37.5 Baht/hr.  "Given that the average labor rate in the saw blade industry

was already significantly higher -- 61.39 Baht/hr -- which is 64% higher than the enhanced minimum

wage rate of 37.5 baht/hr., it is axiomatic that this particular manufacturing industry would have

remained largely unaffected by this increase."  *Id*. at 14.  Weihai's fuller reply is as follows:

> . . . DSMC counters Weihai by raising two arguments. First, DSMC argues
> that given that "[t]he average labor cost for general manufacturing in 2011 was above
> the increased minimum wage rate . . . under Weihai's logic, the wage for the
> manufacturing sector generally could not have been affected by the minimum wage
> increase -- a position that is entirely inconsistent with its assertion that the increase
> in the general manufacturing labor cost is due solely to the minimum wage increase."
> DSMC Br. at 37 n.8.  However, DSMC misses the point that the average labor cost
> for the general manufacturing sector is based on aggregating the data for 464 distinct
> and disparate manufacturing sectors.  Weihai Br. at 34.  Some of these industrial
> sectors (like saw blades) have higher labor cost (and wage) rates while several others
> could potentially have had wage rates that were lower than the enhanced Thai
> minimum wage rate of 300 Baht/day.  Consequently, the enhanced Thai minimum
> wage rate would have affected all those industries wherein the prevailing wage rates
> were lower than 300 Baht/day.  As a result, even though the average labor cost for
> general manufacturing in 2011 was already above the increased minimum wage rate,
> it went up further on account of buoyancy experienced by all of those impoverished
> industrial sectors where the prevailing wage rates were less than 300 Baht/day.
>
> DSMC's second argument is unpersuasively presumptive and results oriented.
> Based on a hypothetical involving five hand tool workers where the daily wage of
> some of the workers was less than 300 Baht/day, DSMC conveniently argues that
> "even though the average rate had been above the post-increase minimum wage, the
> rise in the minimum wage rate still affected the average rate."  DSMC Br., 37.  As
> such, it should be rejected.  DSMC also argues that since "the average wage rate
> under Code 25939, corresponding to hand tools/hardware manufacturing, was 384
> Baht per day . . . [which] is only 84 Baht per day more than the minimum wage
> increase in 2014, it is highly unlikely that there were no workers under this code that
> were affected by the minimum wage increase."  DSMC Br., 37 n.9.  DSMC
> misconstrues Weihai's arguments.  Weihai never argued that Commerce directly
> apply the industry specific labor cost rate from 2011; instead, Weihai has consistently
> argued that the labor cost surrogate value be determined after inflating the 2011
> industry-specific labor cost by the applicable CPI index.

Weihai Reply at 14-15 (Weihai's bracketing and ellipses).

If the time-period over which Weihai argues for its preferred methodology were shorter, the argument might have more appeal, but the unevenness of wage rates between manufacturing sectors only serves to underscore the speculative nature of Weihai's argument. Whether it might otherwise be reasonable to infer that the rate of wage inflation over the four-year period from 2011 -- in an industry sector which already had as its starting point purportedly higher average wages as compared with other sectors -- must correspond to "the applicable CPI index" (as opposed to being significantly higher or lower during that period in reality[15]), Weihai's arguments are no less presumptive than DSMC's, as they do not sufficiently explain the 28.75 percent to 35.71 percent disparity in the cost of labor between the 2014 Labor Force Survey and the 2011 Industrial Census data even if the latter are adjusted for inflation. The arguments therefore do not undermine Commerce's conclusion on Weihai's inflation-adjustment methodology. *See IDM* at 48.

DSMC argues *Hangzhou Spring Washer Co.* v. *United States,* 29 CIT 657 387 F. Supp. 2d 1236 (2005), supports "use of more contemporaneous but less specific data, where Commerce explained why contemporaneity better advanced the goal of accuracy". DSMC Resp. at 37-38. Weihai contends that decision does not provide that support, because, while upholding Commerce's decision, the court cautioned that "Commerce has the statutory discretion to give greater weight to one over the other, provided it offers a reasoned explanation when such a decision deviates from past *practice*." *Hangzhou Spring*, 29 CIT at 672 (this court's italics). Weihai argues that it reminded the agency of its decision to apply 2006 NSO Industrial Census data to value labor

---

[15]  *Cf*., *e.g.*, Respondents' Administrative Case Br. (Aug. 16, 2016) in case no. A-570-898 (chlorinated isocyanurates from the PRC), IA ACCESS doc# 3501482-01, at page 19 (arguing as to uneven labor inflation rates among different industrial sectors in Mexico).

costs in the prior review, covering the 2012-13 period, and that for the current review Commerce was presented the newer non-contemporaneous 2011 NSO Industrial Census data.  "As such and given its own recent precedent, Commerce was required to provide a reasoned explanation for its reversal in this review."  Weihai did not raise this argument in its motion brief and the court concludes it may not do so at this point.  In any event, the argument does not satisfy the standard of an "agency practice" that would necessitate remand of this issue to Commerce.  *See*, *e.g.*, *Shandong Huarong Machinery Co., Ltd. v. United States*, 30 CIT 1269, 1293 n.23, 435 F.Supp.2d 1261, 1282 n.23 (2006); *Ranchers-Cattlemen Action Legal Foundation v. United States*, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999).

Commerce considered and responded to all respondent arguments with the following: "While the 2011 Industrial Census data are specific to the relevant industry, they are neither contemporaneous with the POR nor as or more detailed than the 2014 Labor Force Survey in terms of matching categories of labor costs specified in the ILO Chapter 6A labor data."  *IDM* at 47-48. In other words, even if the above plaintiff arguments are correct, and even if the court were able to "credit NSO's unambiguous opinion that 'Quarterly Labor Force Survey reports are only a rough estimate of the prevailing labor cost data' and that for valuing 'individual sub-sectors within the manufacturing sector', 'the 2012 Industrial Census report[16] is a far better source as compared to the Quarterly Labor Force Survey reports'" as argued by Wehai,[17] at best that would merely appear to put the 2011 Industrial Census data on "closer footing" with the 2014 data in a contest of which

---

[16]  *See id*.

[17]  Weihai Br. at 37 (emphasis omitted).

data set provided the specificity that Commerce required for purposes of this review when contemplating two imperfect sets of data.

In each proceeding, selection of surrogate values is *ad hoc*, and the contemporaneity of the 2014 data apparently tipped the scales for Commerce's selection for the *Final Results*. In the final analysis, Weihai and Bosun are essentially asking the court to supplant Commerce's finding on the agency's interpretation of the record,[18] which is beyond the standard of "substantial evidence" review. In other words, even if a different result might be obtained were the court to examine the matter *de novo*, the current state of the law is such that Commerce's interpretations of and determinations on the record are entitled to deference. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("as to matters . . . requiring expertise a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*").

## VI. Calculation of Surrogate Truck Freight

To calculate the truck freight surrogate value to the port of export, Commerce relied on two factors for determining that distance: the "standardized" company's location from the Thai *Doing Business* report for 2015, and the destination port. The issue here is Commerce's

---

[18] Weihai also argues that Commerce failed to cite to any record evidence that there would have been a change in NSO's methodology between the issuance of the 2011 Industrial Census data and the 2014 Labor Survey report, but that seems to miss the point that these are not the same types of data sets, and the argument also seems to invert the burden on creating an adequate record, including SV information. *See, e.g., QVD Food*, *supra*; *NTN Bearing Corp.*, *supra*.

determination of the "Port of Bangkok"[19] as the destination port, based on the *Doing Business* report,

which provided the destination port *per* "Port Name: Bangkok".   Commerce reasoned as follows:

> Unlike the previous versions of *Doing Business* in the past reviews, *Doing Business* explicitly identifies Bangkok as the name of the port and the name of the city where the standardized company is located.[ ] Therefore, we do not find that *Doing Business* made a general reference to ports that serve the Bangkok metropolitan area when it explicitly stated that the name of port used to compile these data is Bangkok. Therefore, even if cruise companies and other companies call both ports Bangkok ports as Weihai claims, they are irrelevant to the fact that the freight transportation data compiled in *Doing Business* are based on the transportation from Bangkok to the Port of Bangkok. Also, for the same reason, we find that the quantity of freight the Port of Laem Chabang handles compared to the quantity of freight the Port of Bangkok handles is irrelevant in our valuation of truck freight expense.

*IDM* at 53-54, referencing, *inter alia*, *Tapered Roller Bearings and Parts Thereof, Finished and*

*Unfinished, from the PRC*, 81 Fed. Reg. 1396 (Jan. 12, 2016) (final 2013-14 rev. results), and

accompanying I&D Memo at cmt 2.

            Weihai argues Commerce should have applied a distance factor based on the average

of the distances to both the Port of Khlong Toei (*i.e.*, Bangkok) and the Port of Laem Chabang as

it had in the preliminary results, because the *Doing Business* reference to "Bangkok" as the port is

ambiguous and does not specify whether it is the Port of Bangkok or the Port of Laem Chabang, both

of which are referred to as Bangkok exit ports in commercial vernacular.   *See* Weihai Br. at 24.

Commerce obviously concluded otherwise, and Weihai's "averaging" argument would appear to

concede "Port of Bangkok" as proper in the calculation thereof.

            Nonetheless, Weihai persuades that this determination requires remand at least for

further explanation, or reconsideration if Commerce so chooses, which may involve further

---

[19]   *I.e.*, Khlong Toei port.

development of the record.  The conclusion that "Port Name: Bangkok" is an explicit reference to "Port of Bangkok," of course, is the basis upon which Commerce held irrelevant the fact that cruise and other companies call both ports Bangkok as well as the respective quantities of freight handled by the Port of Laem Chabang compared to the Port of Bangkok, but it remains unclear to the court why "Port Name: Bangkok" should be regarded as substantial evidence of record to support the conclusion that this is an explicit reference to "Port of Bangkok" rather than a mere scintilla.

For example, in addition to its evidence that Khlong Toei and Laem Chabang are referred to as Bangkok ports in commercial parlance, Weihai argued that the "Trading Across Borders Survey" questionnaire that was used for the *Doing Business* report instructs survey participants to respond considering "[t]he *seaport most commonly used by traders*" and report the "Cost of inland transport (from warehouse in «Survey_City» to *seaport*) and handling (loading and unloading)" and also notes that "[t]he main method of transporting the containerized product specified above between the «Survey_City» and the chosen *seaport* is considered."[20]   As such, Weihai argued, the underlying survey "unambiguously" indicates that the expression "Port Name: Bangkok" means a Bangkok *seaport*, record evidence shows that Laem Chabang is the most widely used commercial *seaport* servicing Bangkok, handles 4.4 times the volume of containerized cargo than Khlong Toei port (*i.e*, Port of Bangkok), and shows that the latter is a *riverport*, not a *seaport*.[21] Weihai claims that as this latter fact is undisputed, it suggests that the expression "Port Name:

---

[20]   *E.g.*, Weihai Br. at 25-26, quoting Pets' 2nd SV Cmts (Nov. 2, 2015), Ex. 4B ("Trading Across Borders Case Study Assumptions"), PDoc 306 (Weihai's emphasis).

[21]   *Id*., referencing Weihai's Redacted Rebuttal Case Brief at 34-42 (Apr. 13, 2006), PDoc 384, and Second SV Submission for Weihai-Ehwa (Nov. 2, 2015) at Ex. 5, PDocs 298-301.

Bangkok" actually references the seaport of Laem Chabang, but at a minimum the expression must at least encompass the seaport of Laem Chabang -- in other words, Weihai continues, on a conservative basis substantial evidence supports Commerce's preliminary decision to average the distance from Bangkok to Khlong Toei riverport and Laem Chabang seaport.  Weihai additionally complains of Commerce's "cursory rejection" of the other corroborative published information that Weihai provided (in particular those relevant to the import/export community and trucking companies in its rebuttal brief, PDoc 384 at 37, which demonstrated that Laem Chabang port is also referred to as Bangkok port) as simply "irrelevant" fails to account for relevant evidence fairly detracting from Commerce's conclusion.  Furthermore, Weihai argues, Commerce's decision is inconsistent with its then-recent "precedent" in which it has determined different distance factors when using the *Doing Business* (2015) Thailand report for valuing truck freight.

       "Inconsistent" is the very word, all right, for Commerce's determinations regarding the Bangkok-to-port truck freight distance are, quite literally, all over the map.  Notwithstanding the lack of specificity of the distance between a "model" surrogate commercial company in Bangkok and its "model" commercial port of export in the 2015 *Doing Business* report, one would suppose such a seemingly verifiable fact ought not be a bone of contention, but the parties' arguments reveal wide disparities in Commerce's determinations thereof from review to review.  For one review, Commerce used that report to determine the distance from the city of Bangkok to the exit port to be between 93 km and 183 km.  *Certain Activated Carbon From the PRC*, 80 Fed. Reg. 61172 (Oct. 9, 2015) (final 2013-14 rev. results), accompanying I&D Memo at cmt. 13.  For another, using the same report, it determined that distance to be 37.1 km.  *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the PRC*, 81 Fed. Reg. 1396 (Jan. 12, 2016) (final 2013-14 rev.

results), accompanying I&D Memo at cmt. 3.  For yet another, it determined the distance to be 133

km, *Chlorinated Isocyanurates From the PRC*, 80 Fed. Reg. 39060 (July 8, 2015) (prelim. 2013-14

rev. results), accompanying Decision Memo at 18-19, *unchanged in Chlorinated Isocyanurates From*

*the PRC*, 81 Fed. Reg. 1167 (Jan. 11, 2016) (final 2013-24 rev. results) and accompanying I&D

Memo.  Agency precedent also shows that reliance upon a distance factor that is an average distance

to the two ports near Bangkok (the Bangkok Port and the Laem Chabang Port) when determining

surrogate value for truck freight based on the *Doing Business: Thailand* report is not unusual.  *E.g.*,

*Multilayered Wood Flooring From the PRC*, 80 Fed. Reg. 41476 (July 15, 2015) (*inter alia*, final

2012-13 rev. results), accompanying I&D Memo at cmt. 9.

        DSMC's and the government's attempted rebuttal(s) of Weihai's contention, by

pointing out that the *Final Results* are consistent with *Tapered Roller Bearings* above and arguing

that Weihai's contention relies on outdated precedent, only underscores the inconsistency among

Commerce's various administrative determinations on the freight distance to the Bangkok port of

commercial exit.  The defendant contends that the *Doing Business* report for 2015 "explicitly"

identified the Port of Bangkok as the destination port.  However, Weihai's arguments, recitation of

the evidence of record, and the administrative precedents discussed by the parties, persuade that the

*IDM*'s reasoning does not evince complete consideration or address of Wehiai's arguments on the

record by the agency.  Those appear to be of cogent materiality, as more fully described in Weihai's

briefing, and thus the determination on the meaning of "Port Name: Bangkok" as stated in the *Doing*

*Business* report is unclear.  *See United States v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 252

(2d Cir. 1977) ("[i]t is not in keeping with the rational [agency] process to leave vital questions,

raised by comments which are of cogent materiality, completely unanswered").  In the absence of

full consideration and explanation, "Port Name: Bangkok" cannot be concluded to amount to more than a mere scintilla, and as that also appears to be the only buttress upholding the determination of truck freight distance, the derivative conclusions of irrelevancy expressed in the *IDM* appear to amount to circular reasoning. The defendant also contends the court should decline Weihai's argument for the agency to take administrative notice and for the court to take judicial notice of the *Doing Business* report for 2016, but that contention is mooted by the foregoing, upon which the issue of the agency's determination of truck freight distance must be, and hereby is, remanded in order to more fully address Weihai's arguments with respect thereto.

## VII.  Treatment of Graphite Plates as Direct Material

Jiangsu Fengtai also challenges Commerce's accounting of its graphite plates as indirect rather direct materials consumed in production.

Normal accounting practice treats direct materials as raw materials and indirect materials as part of factory overhead. *See*, *e.g.*, *Polyvinyl Alcohol from the PRC*, 68 Fed. Reg. 47538 (Aug. 11, 2003) (final less than fair value ("LTFV") determination) and I&D Memo at cmt. 7.  In administering NV in accordance with 19 U.S.C. §1677b(c)(1), Commerce distinguishes between direct and indirect material cost treatment on a case-by-case basis.  *See, e.g.*, *Magnesium Corp.*, *supra*, 166 F.3d at 1372 (the statute "gives Commerce broad discretion in valuing the factors of production on which factory overhead is based").

The defendant explains that Commerce considers various criteria in determining whether to classify a material as direct or indirect, for example whether the material is physically incorporated into the final product, the material's contribution to the production process, the relative

cost of the input material, and how the cost of the input is typically treated in the industry.[22]  Where

a process material must continually be replenished, Commerce has determined that the input should

be treated as direct material rather than indirect material that is part of factory overhead.  *See*

*Silicomanganese from the PRC*, 65 Fed. Reg. 31514 (May 18, 2000) (final results admin. review),

and accompanying I&D Memo at cmt. 1.  Conversely, where process materials are not consumed in

the production process but are reused and infrequently replaced, Commerce has determined that the

input is an indirect input and classified it as part of factory overhead.  *See Laminated Woven Sacks*

*from the PRC*, 73 Fed. Reg. 35646 ( June 24, 2008) (final deter.), and accompanying I&D Memo at

cmt. 1; *see also Bridgestone Americas, Inc. v. United States*, 34 CIT 573, 576-77, 710 F. Supp. 2d

1359, 1363-64 (2010) (sustaining administrative discretion to consider some or all of these criteria

in direct and indirect material analyses).

          In the *Final Results*, Commerce determined that the graphite plates were direct

materials because they were replaced "regularly" in the course of production of subject merchandise.

*IDM* at 43-44.  The record shows that Jiangsu Fengtai used graphite molds that were replaced every

258 production cycles.  *See id.;* CDoc 297 at 2.  Jiangsu Fengtai agrees with this observation.  *See*

Jiangsu Fengtai Br. at 20.  Jiangsu Fengtai also agrees as to the certain amounts of graphite molds

used each day and the certain amounts of DSBs produced each day. *Id.* at *22*; CDoc 297 at 2.

Jiangsu Fengtai argues, however, that Commerce's treatment of the graphite plates as direct rather

---

          [22]  *See*, *e.g.*, *Persulfates from the PRC*, 70 Fed. Reg. 6836 (Feb. 9, 2005) (final results of
admin. review) and I&D Memo at cmt. 4; *Polyvinyl Alcohol from the PRC*, 68 Fed. Reg. 47538
(Aug. 11, 2003) (final LTFV determination) and I&D Memo at cmt. 7; *Certain New Pneumatic
Off-The-Road Tires from the PRC*, 73 Fed. Reg. 40485 (July 15, 2008) (final LTFV determination)
and I&D Memo at cmt. 27.

than indirect materials is not supported by substantial evidence because Commerce's relied upon an incorrect arithmetic formula to calculate the number of day(s) in Jiangsu Fengtai's production process that a graphite plate with a useful life of 258 production cycles would have to have been employed before being replaced, and that Commerce's analysis was based on the false assumption that each graphite plate would be used consecutively in 258 production cycles.  *See* JF Br. at 18-24.

Jiangsu Fengtai argues the record rather shows that graphite plates are, in fact, durable and replaced only infrequently in the production process.  Jiangsu Fengtai argues the apparent mathematical analysis employed in the *Final Results* to substantiate that finding is marred, and "[i]f the final results were based upon an incorrect mathematical calculation, differing in results by a factor of three, by definition, such determination cannot be based upon substantial evidence".  *See*, *e.g.*, JF Reply at 10.  Jiangsu Fengtai further argues that "[s]ince all manufacturing overhead costs were fully accounted for in Commerce's application of surrogate financial ratios, inclusion of graphite plates as a raw material input resulted in a double-counting of the costs attributable to graphite plates."  JF Br. at 18 (referencing its administrative case brief at 12-16).

Jiangsu Fengtai failed to raise this latter argument with precision before Commerce and therefore failed to exhaust its administrative remedies on the point.  *See* 28 U.S.C. §2637(d); *see*, *e.g.*, *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (requiring, subject to certain exceptions not applicable here, the exhaustion of administrative remedies as a prerequisite to judicial review). *Cf.* JF Admin. Case Br. at 12-16. Even if exhaustion were inapplicable, Jiangsu Fengtai does not explain why indirect materials in the surrogate financial statement would necessarily include "overhead for graphite plates."  The argument rather begs the question, *i.e.,* on whether its graphite plates are properly accounted for as direct or indirect materials costs.

Jiangsu Fengtai stresses that Commerce overestimated the number of graphite plates used because the administrative record allegedly shows that graphite plates were only used in the sintering process, which Jiangsu Fengtai alleges takes so much time that a graphite plate could realistically be used only once or twice per day.  JF Br. at 22-23.  Regardless, the *Final Results* do not employ particular "mathematical" analysis to determine whether the graphite plates are direct or indirect material but rather appeal to simple logic along a sliding scale of durability.  As the defendant argues, whether the proper estimate is lower or higher, Commerce's determination is consistent with past instances where Commerce has considered the frequency with which a part of the production process is replaced and with its practice of treating graphite plates as process materials if they are replaced "regularly" in the course of producing subject merchandise.  *See* Def's Resp. at 61, referencing *Diamond Sawblades and Parts Thereof from the PRC*, 71 Fed. Reg. 29303 (May 22, 2006), I&D Memo at cmt. 2 (contrasting respondent's use of steel molds versus graphite molds, both of which are used in the production process, and finding that steel molds have a long usage life and are properly considered overhead, in contrast to graphite molds which are absorbed into the final product and replaced so regularly that they are valued as a direct input).  The defendant contends Commerce simply found in this administrative review that the record did not demonstrate that the graphite plates have a sufficiently long usage life to be considered an overhead cost.  *See IDM* at 44; CDoc 297 at 2.

At the end of the day, Jiangsu Fengtai's arguments on this issue do not persuade that its original reporting of its graphite plates as direct material[23] was incorrect.  Jiangsu Fengtai is

---

[23]  The defendant also stresses that Jiangsu Fengtai reported graphite plates to Commerce as
(continued...)

essentially asking for a ruling on the meanings of "durability" and "regularly" with regard to

replacement in production, but those are matters properly within Commerce's reasonable domain.

## VIII.  Selection of Surrogate Financial Statement

Commerce derives financial ratios by selecting one or more surrogate financial

statements.  In both the preliminary and final results, Commerce selected the financial statements

of a Thai company, K.M. & A.A. Co., Ltd. ("KM"), after finding that company's production

comparable to the subject merchandise and a subject of the primary surrogate country during the

POR and fiscal year 2014.  *PDM* at 23; *IDM* at 42.  Weihai challenges this selection on two grounds.

### A

The first of Weihai's challenges on this issue concerns semantics.  After issuance of

the preliminary results, both Weihai and DSMC submitted comments and evidence concerning the

translation of a Thai term in KM's financial statements.  *IDM* at 42 n.151, citing PDocs 331, 354,

355.  The translation of the particular term[24] was relevant in determining whether KM was a

producer of comparable merchandise.  *IDM* at 42.  Weihai argued that the Thai term meant "grinding

*stone*," submitted a translation supporting its argument, and argued that KM was therefore not a

producer of comparable merchandise.  *IDM* at 41; PDoc 354 at Ex. 2.  DSMC, in turn, submitted

---

[23]  (...continued)
a direct material, calculated factors of production for them, and did not amend or otherwise update
its reporting in subsequent supplemental responses.  *See*, *e.g.*, JF Br. at 18.  The court puts little stock
in that contention, as parties, like Commerce, are not "wedded" to particular positions throughout
the course of a proceeding but may evolve their thinking and interpretations as new data are placed
on the record.

[24]  *I.e.,* " หินเจียร ".  *See*, *e.g.*, Weihai Br. at 9.

documents indicating that the word at issue translated to "grinding *wheel*" and thus would support

the finding that KM was a producer of comparable merchandise.  *IDM* at 41.

    In response to these submissions, Commerce conducted its own research and placed

several documents on the record. *IDM* at 42; PDoc 356.  The first document demonstrated that the

dictionary definition of the word was "grinding stone."  PDoc 356 at 2.  The three other documents

demonstrated that in the abrasives industry, the same word translated to "grinding wheel." *Id.* at 3-5.

Commerce invited comments from interested parties on the seeming polyseme, and the petitioner

(only) submitted comments. *See IDM* at 42; PDoc 358.  Based on such research and commentary,

Commerce found KM a producer of comparable merchandise. *See* 19 U.S.C. §1677b(c)(1).

    The issue here is whether, in order to support Commerce's finding that KM was a

producer of comparable merchandise, substantial evidence on the record supports Commerce's

determination that the translation of the Thai word at issue means "grinding wheel" as opposed to

"grinding stone".

    Weihai argues that Commerce erred in selecting KM's financial statement. Weihai's

argument, that KM is not a producer of comparable merchandise because the record evidence "only"

supports finding that the Thai word in dispute means "grinding stone" and not "grinding wheel," is

insufficient to overcome Commerce's conclusion from the record that the Thai word at issue as used

in the abrasives industry means "grinding wheel."  Commerce found that a translation from a

third-party translation agency, KM's own website, and websites of other companies in the abrasives

industry, taken together, demonstrate that the Thai word at issue means "grinding wheel".  *IDM* at

42.  *See* PDocs 355, 356.  Commerce explained that although the dictionary definition of the Thai

word at issue means "grinding stone", in the Thai abrasives industry it is used as a hyponym, *i.e.,*

"grinding wheel." *See id.*   Commerce also relied on copies of KM's website, which were

contemporaneous with the POR, which demonstrated that KM produced grinding wheels. *Id.;* CDoc

263 at Ex. 1C.   Notwithstanding Weihai's arguments in this regard (*see* Weihai Reply at 5-7,

quoting, *inter alia*, *Yantai Xinke Steel Structure Co. v. United States*, 38 CIT ___, Slip Op. 14-38

at 30-31 (Apr. 9, 2014)), the inferences from that evidence constitute substantial evidence of record

that KM did, in fact, produce grinding wheels during the POR.   Websites of other companies in the

same industry also, apparently, demonstrated that the word is employed to mean "grinding wheel."

PDoc 356.   In short, Weihai's arguments presented here to the contrary do not persuade that

Commerce's conclusion thereon was unreasonable.[25]

B

Weihai argues nonetheless that it was unreasonable for Commerce to select KM's

financial statements rather than those of Trigger Co. Philippines, Inc. ("Trigger"), a producer of

DSBs and subject to a country not on Commerce's list of surrogate countries prepared for the review

("OP List").[26]   *See* Weihai Br. at 10-21.   On this point, Weihai first contends Commerce's

determination in this administrative review differs from its determination in the previous

---

[25]   Weihai also raises reliability concerns over the translation provided by DSMC, arguing that the translation company's conclusion that the Thai word that was translated to grinding wheel "resulted from a discussion with the Petitioners", Weihai Br. at 13, but that argument is undermined by the apparent fact that the translation that Weihai provided was from the same translation company used by DSMC.   *Compare* PDoc 354 *with* PDoc 355.

[26]   Bosun also challenges Commerce's determination with respect this issue. *See* Bosun Br. at 2-6.   In response, the defendant points out that Bosun did not raise this issue in its administrative case brief and therefore it failed to exhaust its administrative remedies.   Def's Resp. at 62, referencing *Corus Staal* BV, 502 F.3d at 1379.   By not addressing that point in its reply but arguing only further on the merits, Bosun has apparently conceded the point.

administrative review.  But, Commerce's determinations are made on the basis of the administrative

record before it,[27] and the fact that Trigger's financial statements were used in the prior

administrative reviews does not necessarily inform as to what is the best available information for

a subsequent review.  *See Downhole Pipe & Equipment LP v. United States*, 36 CIT ___, ____, 887

F. Supp. 2d 1311, 1321 (2012) ("Commerce has broad discretion to determine the best available

information in a reasonable manner on a case-by-case basis") (internal quotation marks and citations

omitted).  In this review, Commerce explained that, unlike the prior administrative review, the record

before it contained a usable financial statement from the primary surrogate country.  *IDM* at 43.  *See*

*also Jacobi Carbons*, *supra*, 41 CIT at ___, 992 F. Supp. 2d at 1376 ("Commerce's single surrogate

country preference is strong and must be given significant weight.").

       Weihai next contests Commerce's non-selection of Trigger's financial statements.

Weihai Br. at 17-21.  Commerce's decision was not only due to the fact that those statements

predated the POR and were therefore not contemporaneous, they were not from the primary surrogate

country.  *IDM* at 43.  Weihai does not dispute those observations, *see* Weihai Br. at 27-28, but it

argues that the Trigger financial statements fell short of contemporaneity "by two months only" and

that "contemporaneity alone is an insufficient justification for dismissing better surrogates." *Id*. at

17, quoting *Blue Field (Sichuan) Food Industry Co. v. United States,* 37 CIT ___, ___, 949 F. Supp.

2d 1311, 1332 (2013).  As stated, however, Commerce did not rely upon contemporaneity alone for

the *Final Results*, Commerce selected KM's financial statements because they pertained to a

---

[27] *See, e.g.*, *Yama Ribbons and Bows Co., Ltd. v. United States,* 36 CIT ___, ___, 865 F. Supp. 2d 1294, 1299 (2012) ("Commerce must base its decisions on the record before it in each investigation.").

producer of comparable merchandise from the primary surrogate country in addition to being

contemporaneous.  *See Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United

States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("[i]n determining the valuation of the factors of

production, the critical question is whether the methodology used by Commerce is based on the best

available information and establishes antidumping margins as accurately as possible.").

        Weihai argues, nonetheless, that the fact that Trigger's financial statements are from

the Philippines should not be an impediment.  *See* Weihai Br. at 18-20.  It argues that KM's financial

statements were not as detailed as Trigger's, for example with respect to inventories open and closed

and has no specific line item for outward freight and handling, and that Commerce should conduct

a "side by side" comparison of KM's and Trigger's financial statements in accordance with *CP

Kelco US, Inc. v. United States*, 40 CIT ___, Slip Op. 16-36 (Apr. 8, 2016).

        Responding, DSMC contends "neither Weihai nor any other party argued below that

KM's statements were flawed by reason of a lack of detail" and therefore Weihai's argument suffers

from a failure to exhaust its administrative remedies.[28]  *See* DSMC Br. at 24.  Weihai replies that it

did exhaust, by alerting Commerce to the fact that "the 2013 Trigger financial is the most detailed

statement available on record" and by discussing breakouts of certain specific line items in Trigger's

financial statement in its administrative case brief.

_____

        [28]   The court has discretion to require exhaustion of administrative remedies "where
appropriate", 28 U.S.C. §2637(d), *see*, *e.g.*, *Cemex, S.A. v. United States*, 133 F.3d 897, 905 (Fed.
Cir. 1998), but it tends towards a "strict" requirement of exhaustion in the international trade law
context.  *See*, *e.g.*, *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 644, 342 F. Supp.
2d 1191, 1205 (2004).

That is a weak reed.  Arguing in favor of particular financial statements for the

purposes of an administrative review does not equate to a reason for impugning the usability of

others on the record.  The requirement of exhaustion, generally speaking, imposes a more rigorous

standard on the precision of argumentation at the administrative level,[29] but even if it could be stated

that Weihai did exhaust, the arguments it advances do not suffice to overcome Commerce's

regulatory preference to value all factors of production using data from a single surrogate country

wherever possible.  *See* 19 C.F.R. §351.408(c)(2).  That approach that has not been held, *per se*,

unreasonable.  *See*, *e.g.*, *Jacobi Carbons*, 41 CIT at ___, 992 F. Supp. 2d at 1376; *Camau Frozen*

*Seafood Processing Import Export Corp. v. United States*, 37 CIT ___, ___, 929 F. Supp. 2d 1352,

1355-56 (2013).

---

[29]  *See*, *e.g.*, *Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017); *Stanley Works (Langfang) Fastening Systems Co. v. United States*, 41 CIT ___, ___, 279 F. Supp. 3d 1172, 1189 (2017) ("[b]road, generalized challenges to the differential pricing analysis do not incorporate any conceivable challenge to elements of that analysis"); *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 41 CIT ___, Slip Op. 17-152 at 12-13 (Nov. 17, 2017) (mere notice fails to accomplish the twin purposes of the exhaustion requirement); *Weishan Hongda Aquatic Food Co. v. United States*, 41 CIT ___, 273 F. Supp. 3d 1279, 1286 (2017) ("exhaustion generally requires a party to present *all* arguments in its administrative case and rebuttal briefs before raising those issues before this court") (emphasis in original; citations omitted), *appeal filed sub nom. China Kingdom (Beijing) Import v. United States*, No. 18-1375 (Fed. Cir. Jan. 3, 2018); *Seah Steel Vina Corp. v. United States*, 41 CIT ___, ___, 269 F. Supp. 3d 1335, 1350 (2017) (failure to exhaust argument that selected financial statements did not represent producer of subject merchandise); *Union Steel Manufacturing Co. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1307, 1332 (2012) ("mere fact that relief was unlikely is insufficient as a ground to waive the exhaustion requirement").  *Cf. also*, *e.g.*, *Great American Insurance*, *supra*, 738 F.3d at 1328 ("[i]t is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived"); *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578, 659 F. Supp. 2d 1303, 1308 (2009) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[; i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones") (citation omitted).

The problems Wehai attempts to overcome are not only that the contested financial statements concern companies from different countries, its preferred financial statements (for Trigger) pertain to a producer subject to a country that is not even on the OP List for this review, which remains the case notwithstanding its arguments that the Philippines should be regarded as economically comparable to the PRC.  *See*, *e.g.*, Weihai Reply at 11-12.  In the final analysis, even if those problems can be surmounted, Weihai's overall contention, once again, is effectively asking the court to supplant Commerce's decision from its consideration of KM's versus Trigger's financial statements.  *See*, *e.g.*, Weihai Reply at 11 ("the less than ideal albeit reliable Trigger financial statement is preferable to [KM]'s financial statement, which is not only unreliable but is also beset with poor data quality") (court's bracketing).  The court's role, however, is not to re-weigh the evidence of record, it is solely to determine whether the evidence of record to support Commerce's determination is "substantial," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion".  *E.g.*, *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).

Here, neither of the contested financial statements are "perfect" for the purpose of determining surrogate financial ratios for this administrative review, and while one might well conclude that KM's financial statements offer more detail and relate to a producer of DSBs (not merely "comparable" merchandise), the mere fact that the record may support a different choice of financial statement does not mean Commerce's choice is unsupported by substantial evidence.  *See Universal Camera Corp.*, *supra*, 340 U.S. at 488.  *Cf.*, *e.g.*, *Catfish Farmers of America v. United States*, 33 CIT 1258, 1273 (2009) ("[w]here Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a

surrogate value so long as its decision is reasonable"). Given all the variables involved in Commerce's decision-making, the court cannot conclude that the KM and Trigger financial statements are not "fairly conflicting." The record contained detailed and contemporaneous financial statements from a producer of comparable merchandise in the primary surrogate country, and Commerce determined those statements to be the best available evidence on the record for purposes of the review. *IDM* at 43. Weihai does not persuade that a different result must be obtained.

IX.  Inclusion of Weihai in the Administrative Review

Weihai also challenges Commerce's determination to reject the request from Robert Bosch Tool Corporation ("Bosch") to rescind its request for review of Weihai.

A.  Background

Commerce issued its notice of opportunity to request an administrative review on the antidumping order for DSBs from the PRC in November 2014. *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 79 Fed. Reg. 65176 (Nov. 3, 2014) (opp. to req. admin. review). DSMC, Weihai, and Bosch timely filed review requests for Weihai.[30] Commerce initiated the administrative review of the POR for DSBs from the PRC the following month. *Antidumping and Countervailing Duty Administrative Reviews*, 79 Fed. Reg. 76956 ( Dec. 23, 2014).

19 C.F.R. §351.213(d)(1) provides that if a party requesting administrative review withdraws that request within 90 days of publication of the review's initiation notice, Commerce will rescind the review. The regulation also states that the "Secretary may extend this time limit if the Secretary decides that it is reasonable to do so." Under that provision, the parties had until March

---

[30]  *See, e.g.*, PDocs 3 (DSMC request for review), 6 (Bosch request for review). DSMC also requested review of other DSB producers.  *See* PDoc 3.

23, 2015 to rescind their request for review.  DSMC and Weihai submitted timely requests to

withdraw their review requests with respect to Weihai.  *See* PDoc 108, 109.  Bosch's request for

review of Weihai, however, remained on the record.  PDoc 133.

On April 7, 2015, Commerce selected Jiangsu Fengtai and Weihai as the mandatory

respondents.  PDoc 133.  On the same day, Commerce issued its questionnaires.  *Id.*  On April 8,

2015, sixteen days after the deadline to rescind a request, Bosch attempted to rescind its request to

review Weihai.  PDoc 119.  Bosch's request noted that Commerce has previously interpreted the

regulation to allow rescission where it has not committed substantial resources to the review, the

review has not progressed to a point where it would be unreasonable to allow withdrawal of requests

for review, and withdrawal does not constitute "abuse" of departmental procedures.  *Id*.  Bosch

argued that the circumstances of the case thus far was in accordance with such conditions.  *Id*.

Weihai then filed its own submission in support of Bosch's request to Commerce to

accept Bosch's belated request to withdraw its request for review of Wehai.  Bosch's request argued

that certain "unexpected events" should excuse its late filing in accordance with Commerce's then-

current policy.  PDoc 120.  *See* Weihai 56.2 Br. at 46-47.  DSMC also supported Weihai's and

Bosch's request to accept the latter's withdrawal request.  PDoc 121.

Commerce rejected Bosch's request to withdraw its review request of Weihai on May

12, 2015, stating that it did not find that the facts Bosch advanced to explain the late filing

constituted "extraordinary circumstances" in accordance with *Extension of Time Limits; Final Rules*,

78 Fed. Reg. 57790, 57793 (Sep. 20, 2013) ("*Final Rules*").  PDoc 133.

B.  Analysis

Weihai argues Commerce's decision was unlawful because the procedural background of this case resembles that of *Glycine & More, Inc. v. United States*, 39 CIT ___, 107 F. Supp. 3d 1356 (2015), *remand results sustained*, 40 CIT ____, 181 F. Supp. 3d 1360 (2016) ("*Glycine & More*"), *affirmed*, 880 F.3d 1335 (Fed. Cir. 2018).  The defendant disagrees, arguing that Weihai did not raise the issue of the denial of its request to rescind the review in its administrative case brief and therefore failed to exhaust its administrative remedies.  In the alternative, the defendant argues Commerce acted lawfully by including Weihai in the administrative review, due to the outstanding request by Bosch for review of Weihai.

The defendant's alternative argument is undercut by *Glycine & More*'s holding that a certain 2011 published guidance document[31] ("*2011 Notice*), which is also implicated in the matter at bar. was an unlawful interpretation of 19 C.F.R. §351.213(d)(1).  In that case, the sole U.S. petitioner submitted a timely request for rescission of the review.  "Baoding," a respondent in the proceeding, also desired rescission, but its request therefor was not timely submitted.  Baoding thereafter notified Commerce that it would no longer participate in the review.  Proceeding nonetheless, Commerce's preliminary results assigned Baoding the PRC entity rate.  Thereafter, Glycine & More appeared in the proceeding and filed a case brief objecting to Commerce's rejection of Baoding's request to withdraw the review request and also assignment of the PRC-wide rate.  *See generally* 39 CIT at ___, 107 F. Supp. 3d at 1358-59.  In the final results thereof, Commerce's refusal to rescind the review was grounded upon the *2011 Notice* that, as subsequently observed by

---

[31]  *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 76 Fed. Reg. 45773 (Aug. 1, 2011).

the Court of Appeals for the Federal Circuit, "dramatically changed [the] meaning" of 19 C.F.R.

§351.213(d)(1) to require a showing of "extraordinary circumstances" which "prevented" the ability

to submit a timely request for rescission.  880 F.3d at 1340, quoting *2011 Notice*, 76 Fed. Reg. at

45773.  The appellate court has decided the *2011 Notice* was unambiguous and an "incompatible

departure from the clear meaning of the regulation[,] . . . not simply an interpretive statement

regarding ambiguity in the regulation or a general statement of policy" *Id*. at 1345.  Because the *2011*

*Notice* lacked "the necessary notice-and-comment rulemaking, it has no legal standing, and thus

provides no basis upon which the Secretary could make his decision."  *Id*.

    Weihai argues in reply to the defendant's points regarding exhaustion that the doctrine

should not bar its challenge, that applicable precedent compels rescission, and that it would be

inappropriate to preclude judicial recourse because it had vigorously urged Commerce to rescind the

review as to it at the very outset of the proceeding, a position with which petitioner itself agreed.

At the end of the review, Weihai continues, rearguing for rescission in its case brief, a review during

which it had been forced to expend substantial resources participating, would have been "futile."

Weihai contends that once Commerce denied its rescission request in May 2016, Commerce

rendered an "irreversible" decision to proceed with the review, and as a result Weihai was forced to

proceed or suffer the penalty of incurring an adverse facts available result if it did not.  Thus, Weihai

submits, "the damage was done", and under these circumstances, Weihai complains, it should not

have been obligated to brief agency reconsideration of the rescission that had already been denied

unequivocally, because by doing so it would in effect be asking Commerce to ignore its participation

in the administrative review -- as if a subsequent reversal of the earlier rescission denial could undo

the prejudicial impact of the initial denial. "Adherence to such an absurd formality would not be

'appropriate.'" Weihai Reply at 40, quoting 28 U.S.C. §2637(d).

> However, the defendant's response correctly points out that the background of the

matter at bar differs materially from that of *Glycine & More*, in which that plaintiff presented in its

administrative case brief "all arguments that continue to be relevant to the Secretary's . . . final

results".[32] 19 C.F.R §351.309(c)(2). Weihai did not do likewise. Rather, it argues the gesture would

have been futile. To persuade on that argument, "a party must demonstrate that it would be required

to go through obviously useless motions in order to preserve its rights." *Corus Staal BV v. United

States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quoted decisions omitted). The inability of an agency

to provide an adequate or appropriate remedy, for example, would trigger futility. *PPG Indus., Inc.

v. United States*, 14 CIT 522, 542, 746 F. Supp. 119, 137 (1990) (futility applies where "the agency

has no power to provide the remedy sought, or where the remedy would be manifestly inadequate"

(citations omitted)). Futility may also be shown where "an agency has articulated a very clear

position on the issue which it has demonstrated it would be unwilling to reconsider." *Pakfood Pub.

Co. v. United States*, 34 CIT 1122, 1145, 724 F. Supp. 2d 1327, 1351 (2010) ("*Pakfood*"), quoting

*Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105 (D.C. Cir. 1986). *Pakfood*

observed that in the case of the latter, the agency's commitment to its position must be so strong as

to render requiring a party to raise the issue with the agency "'inequitable and an insistence of a

useless formality.'" 34 CIT at 1145-46, 724 F. Supp. 2d at 1145-46, quoting *Luoyang Bearing

Factory v. United States*, 26 CIT 1156, 1186 n.26 (2002) (internal quotation marks and citation

---

[32] Regulatory exhaustion is "explicitly imposed by the agency as a prerequisite to judicial review." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

omitted). *Cf. Itochu Building Prods. v. United States*, 733 F.3d 1140, 1147 (Fed. Cir. 2013) ("there

was no reasonable prospect that Commerce would have changed its position").

   The court is not persuaded that raising the issue in Weihai's administrative case brief

would have been futile.  "[T]he mere fact that Commerce rejected an argument at an earlier stage of

an administrative proceeding does not, without more, suffice to render a party's continued adherence

to such argument an exercise in futility." *Pakfood*, 34 CIT at 1146, 724 F. Supp. 2d at 1351 (citation

omitted).[33]  "Even where it is likely that Commerce would have rejected a party's arguments without

changing course, 'it would still [be] preferable, for purposes of administrative regularity and judicial

efficiency, for [the party] to make its arguments in its case brief and for Commerce to give its full

and final administrative response in the final results.'" *Id.*, quoting *Corus Staal*, 502 F.3d at 1380.

Had the *Final Results* announced a rate that was more favorable to Weihai, it would hardly be here

to complain; indeed, Weihai's claim at this point highlights part of the reason for the agency's

adoption of the 90-day deadline for withdrawing requests for review in the first place.  *See*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27317 (May 19, 1997) ("we are

concerned with the situation in which a party requests a review, the Department devotes considerable

time and resources to the review, and then the party withdraws its request[ ] once it ascertains that

the results of the review are not likely to be in its favor").

   Nonetheless, it is apparent that *Glycine & More* has altered the legal *status* upon

which rests the administrative decision not to accept Borsch's belated request to withdraw its request

---

  [33] *See also*, *e.g.*, *PPG Industries*, 14 CIT at 543, 746 F. Supp. at 137 ("that a party to an administrative proceeding finds an argument may lack merit, or had failed to prevail in a prior proceeding based on different facts, does not, without more, rise to the level of futility").

for review.  That is a new and authoritative legal decision that appears to impact directly the legal

underpinning of the underlying administrative decision, and the doctrine of intervening judicial

interpretation applies here.  *See Sucocitrico Cutrale Ltda. v. United States*, 36 CIT ___, ___, Slip

Op. 12-71 at 5-7 (2012); *Corus Staal BV v. United States*, 30 CIT 1040, 1050 n.11 (2006). *Cf. SKF*

*USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001), referencing, *inter alia*, *Nat'l Fuel*

*Gas Supply Corp. v. Fed. Energy Regulatory Comm'n,* 899 F.2d 1244, 1249 (D.C. Cir. 1990)

(granting Commission's request for remand following new legal decision).   Remand of the

administrative decision not to accept Bosch's 16-day late request to withdraw its review request,

which decision was based on the "extraordinary circumstances" standard of the invalidated *2011*

*Notice*,  is also consistent with "[t]he general rule . . . that an appellate court must apply the law in

effect at the time it renders its decision." *Thorpe v. Housing Authority of City of Durham*, 393 U.S.

268, 281 (1969).

## Conclusion

          For the above reasons, the case is hereby remanded to the  International Trade

Administration, U.S. Department of Commerce for further proceedings consistent with this opinion.

The results of remand shall be due July 20, 2018, and by the fifth business day after the filing thereof

with the court, the parties shall confer and file a joint status report as to a proposed scheduling of

comments, if any, on those results.

          **So ordered.**

                                                   ___/s/  R. Kenton Musgrave_____
                                                   R.  Kenton Musgrave, Senior Judge

Dated: March 22, 2018
          New York, New York